IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEITH BROWN, ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | Civil Action No. 05-826 |
| ) | |
| JEFFREY BEARD, Pennsylvania State ) | |
| Prison Commissioner, et al., ) | |
|     Defendants. ) | |
| ) | |

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that Plaintiff's request for a preliminary injunction and/or for a temporary restraining order (Docket No. 57) be denied without prejudice.

II.    Report

Plaintiff, Keith Brown, an inmate currently incarcerated at the State Correctional Institution at Fayette ("SCIF") and formerly incarcerated at the State Correctional Institution at Pittsburgh ("SCIP"), has presented a second amended civil rights complaint.[1] Named as defendants are Department of Corrections ("D.O.C.") Commissioner Jeffrey Beard, Dr. Frederick Maue, Dr. Lance Couturier, Dr. Ravindranath Kolli, Dr. Pete Saavedra, psychologists Gary Gallucci and David Yanak, grievance officer Carol A. Scire and Dr. Adam Edelman, who is the

---

[1] This action was originally commenced in the United States District Court for the Middle District of Pennsylvania on December 8, 2004 and on March 18, 2005, Plaintiff filed an amended complaint. On June 17, 2005, the case was transferred to this Court pursuant to 28 U.S.C. § 1404(a) since the events about which he complains occurred in this District and all but one of the defendants resides in this District. Plaintiff's second amended complaint was filed on September 28, 2005 (Docket No. 52).

director of prison health services for the D.O.C. In the second amended complaint, Plaintiff alleges that he has a mental health problem and has made several suicide attempts; that in retaliation for his not accepting a settlement in another case, defendant Beard directed that he be placed in the Long Term Segregation Unit ("LTSU"); that he explained to defendant Kolli that because of his mental health problem he could not be placed in the LTSU and Kolli replied that the D.O.C. could do anything it wanted to do; that on December 5, 2003,[2] he was placed in the LTSU at which time he explained to defendants Gallucci and Kolli that it was improper to house him in that unit since it is isolated and does not provide psychiatric help; that he explained to Gallucci and Kolli that he was experiencing anxiety attacks and hallucinating and they ignored his pleas; that on June 25, 2003 he again attempted to commit suicide; that despite his pleas, in violation of D.O.C. policy, defendant Kolli refused to house him in the prison hospital; that on June 27, 2003, he was provided a shaving razor by officer Pretrosky and again attempted to commit suicide in front of officers Blakey and Bersy; that when he was returned from the hospital, he was restrained resulting in extreme pain which lasted all night until R.N. Bell called the security personnel to loosen the restraints; that again defendants Kolli and Gallucci refused to move him to the mental health unit of the facility; that he was retained in the LTSU by defendants Kolli, Gallucci, Maue, Couturier and Beard because he is black; that when Judge Rambo of the Middle District of Pennsylvania inquired as to why he was not being housed in an observation cell, Kolli related that there was no room in the observation cell and as a result Judge Rambo approved his continued housing in the LTSU; that on December 10, 2003, he spoke to

---

[2]   From the nature of the complaint, it would appear that this housing occurred in 2002 and not 2003 as stated in the second amended complaint.

defendant Maue and explained his need to be moved to the mental health unit; that on January 1, 2004, he was transferred from SCIP to the LTSU at SCIF where he was seen by defendants Saavedra, Gallucci and Yanak to whom he explained his need for alternative housing and who only replied that they could move him to a strip cell within the LTSU; that defendant Couturier, along with defendants Maue, Kolli, Gallucci, Yanak and Saavedra, conspired to deprive him of his lithium medication; that defendant Scire delayed and destroyed his grievances over these mental health issues; that defendant Beard had knowledge of these violations and approved their continuation; and that when he contacted defendant Edelman, who is the Medical Director of the health service, about his problems, Edelman not only ignored his requests but conspired with the others to deprive him of adequate medical attention. These facts are said to state a cause of action under the provisions of 42 U.S.C. § 1983 and Plaintiff invokes this Court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

On October 19, 2005, Plaintiff filed a Motion for a Preliminary Injunction and Temporary Restraining Order (Docket No. 57). He requests that the defendants stop tampering with his mail; that they stop depriving him of his mental health weekly tracking psychiatric mental health therapy and programming and remove him from the LTSU; that they place him in the mental health unit at SCI Graterford or Cresson for adequate treatment from the irreparable injuries he has suffered from being illegally placed in the LTSU; that they stop Nurse Katrina Shriverlon from depriving him of medication and harassing him because of his litigation and threatening to put stuff in his medication to harm him; that they stop Col. Manns from removing food from his tray and threaten to poison him and trying to get inmate James Price to "spit his death on me (hepatitis)"; that they stop Rob Tretinik and Michael Herbik from conspiring to deprive him of

medical therapy for his herniated disc and order Jeffrey Beard and others to provide adequate outside therapy three times a week; that they order Carol Scire and Mary Ann Kashner to stop harassing him because of this litigation by placing him on grievance restriction; that they order Harry Wilson (warden) to stop depriving him of notary services; that they order the mail room supervisor to stop the mail carrier from giving his mail to the unit official to destroy; and that they order Harry Wilson to stop all officers on the LTSU from harassing him and to allow female correctional staff to work this unit just like male officers.

Federal Rule of Civil Procedure 65, as well as the case law interpreting that rule, provide that in order to obtain a temporary restraining order/preliminary injunction, a plaintiff must demonstrate a reasonable likelihood of ultimate success on the merits; that irreparable harm would result if the relief sought is not granted; that the issuance of the injunctive relief would not result in greater harm to the nonmoving party, and that the public interest would best be served by granting the relief sought. Campbell Soup Co. v. Conagra, Inc., 977 F.2d 86, 90-91 (3d Cir. 1992). Thus, "[t]o obtain a preliminary injunction, the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." Hohey v. Casey, 868 F.2d 69, 72 (3d Cir. 1989).

Moreover, it is the plaintiff's burden to show that the "preliminary injunction must be the only way of protecting the plaintiff from harm." Campbell Soup, 977 F.2d at 91. With respect to the irreparable harm prong of proving entitlement to a TRO, the Court of Appeals for the Third Circuit has emphasized that the "key aspect of this prerequisite is proof that the feared injury is irreparable; mere injury, even if serious or substantial, is not sufficient." United States v. Commonwealth of Pennsylvania, 533 F.2d 107, 110 (3d Cir. 1976). Additionally, in carrying his

4

burden to show irreparable harm, a Plaintiff must make a clear showing that irreparable harm will occur immediately. ECRI v. McGraw- Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987). For "a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a clear showing of *immediate* irreparable harm." Campbell Soup, 977 F.2d at 91 (internal quotations omitted). Indeed, the Court of Appeals for the Third Circuit "insisted that the risk of irreparable harm must not be speculative." Adams v. Freedom Forge Corp., 204 F.3d 475, 488 (3d Cir. 2000).

A request for injunctive relief in the prison context "must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." Goff v. Harper, 60 F.3d 518 (8th Cir. 1995) (citation omitted). Where a plaintiff requests an injunction that would require the court to interfere with the administration of a *state* prison, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." Rizzo v. Goode, 423 U.S. 362, 379 (1976).

Civil Action Nos. 03-466 and 03-352

Prior to filing this case, Plaintiff had filed at least two other cases in this Court, Civ. A. No. 03-352, which he filed on March 13, 2003, and Civ. A. No. 03-466, which he filed on April 4, 2003. In both of those cases, Plaintiff also raised allegations concerning his placement in the LTSU at SCIP and requested transfer to another institution.

On June 24, 2003, the undersigned submitted a report and recommendation, recommending that his request for a preliminary injunction and for a temporary restraining order in Civ. A. No. 03-466 be denied without prejudice. On July 28, 2003, the undersigned submitted

a report and recommendation, recommending that his request for a preliminary injunction and for a temporary restraining order in Civ. A. No. 03-352 be denied without prejudice. Both of these reports and recommendations were adopted by the Court.

In those motions, Plaintiff had claimed that his placement in the LTSU at SCIP was against D.O.C. policy because he suffers from bipolar disorder. In response, Defendants submitted a report by Dr. Sandra Vujnovic, Ph.D. and David Scott Sacks, PSS. They stated as follows:

> Inmate Brown's current LTSU status is solely based upon his chronic and severe behavioral problems exhibited during his present incarceration coupled with the minimal likelihood of his successful completion of the SMU program within a reasonable period of time. This conclusion is based upon the fact that his Severe Axis II Personality Disorder issues would prevent his programmatic progress and inevitably lead to his LTSU placement, anyway. As per DOC policy, this clinical decision was based upon the various clinical assessments made by the mental health treatment staffs at SCI Greene, SCI Pittsburgh and SCI Waymart with the explicit approval of Central Office.
>
> ***
>
> Inmate Brown's management had been further complicated by his predilection for verbalizing spurious suicidal threats and making superficial self-mutilative behaviors which had been intended to foster placement at SCI Pittsburgh's MHU or SCI Waymart's FTC. Psychiatrically, Inmate Brown has had an extensive history of therapeutic contacts during his present incarceration. After an in depth review of his psychiatric and medical records, it appears that although his various psychiatric diagnoses have reflected his self-reports of depressive and psychotic symptoms, his highly disruptive behavior is far more reflective of his severe Antisocial and Borderline Personality Disorder characteristics than any treatable Axis I issues. In fact, during multiple in depth psychological/psychiatric assessments by multiple treatment staffs at SCI Greene, SCI Pittsburgh and SCI Waymart, he has consistently attempted to use and manipulate the Mental Health System to his legal and custodial advantage rather than to seek treatment for the multitude of his supposed psychiatric complaints.
>
> ...Although his behavior has been uniformly viewed as reflecting significant impairment in both judgment and impulse control, to a reasonable degree of

> psychological certainty, Inmate Brown suffers no treatable Axis I Mental Health
> issues (including his prior diagnosis of Bipolar Disorder NOS) and hence exhibits
> no psychological or psychiatric preclusion to his current LTSU placement.
> However, it should be noted that an individual suffering from a treatable Axis I
> issue is not automatically prevented from LTSU placement. Instead, his prior and
> present level of psychological functioning and psychiatric status are seen as a few
> of the many factors that influences the decision to place an individual within the
> LTSU.

(Civ. A. No. 03-466 Docket No. 26 Ex. A at 1-2.)

Similar observations were made by licensed psychologist Gary Gallucci, who wrote the following in an annual psychological evaluation of Plaintiff dated February 28, 2003:

> He has a long history of aggressive behavior. He remains on the Mental Health
> Tracking List but shows no evidence of any overt psychotic thinking (no delusions
> or hallucinations). He had been diagnosed in the past with bipolar disorder and
> had been on medication for such disorder. However, current impressions are no
> Axis I psychiatric diagnosis but strong Axis II Personality Disorder with
> Borderline and Antisocial Features.

(Id. Ex. E.)

Thus, Plaintiff did not demonstrate a likelihood of success on the merits of his claim that his placement in the LTSU was in violation of D.O.C. policy. Rather, the record suggested that he suffered from a chronic and severe behavioral problem, that his placement in the LTSU was the result of his own behavior and that even if he had a treatable mental illness, he could still be placed in the LTSU. In addition, he did not demonstrate that his placement in the LTSU threatened him with irreparable harm.

Moreover, the undersigned noted that, to the extent that Plaintiff alleged that defendants violated his civil rights by refusing to give him adequate medical treatment, it appears that the law clearly affords prison authorities considerable latitude in the manner in which they treat their prisoners. Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993). In addition, "simple medical

7

malpractice is insufficient to present a constitutional violation"; rather, plaintiff must demonstrate that the prison authorities exhibited "deliberate indifference" to his medical needs. Id. See Parham v. Johnson, 126 F.3d 454, 458 n.7 (3d Cir. 1997).

Finally, to the extent that the relief he requested was transfer to another prison, it was noted that a prisoner does not have a reasonable expectation of being housed in a particular prison. Young v. Quinlan, 960 F.2d 351 (3d Cir. 1992).

For the reasons stated in the report and recommendation filed on June 24, 2003 in Civ. A. No. 03-466 and the report and recommendation filed on July 28, 2003 in Civ. A. No. 03-352, the undersigned concludes that Plaintiff has not demonstrated a likelihood of success on the merits of his claims of improper housing in the LTSU and lack of medical treatment, or the existence of irreparable harm.

Another of Plaintiff's complaints concerns the placement of outgoing mail in the prison. As the Court of Appeals for the Third Circuit has noted, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning," and regulations to guarantee prison and inmate security. Prisoner mail is one such area in which inmate behavior is regulated." Nasir v. Morgan, 350 F.3d 366, 370 (3d Cir. 2003) (quoting Turner v. Safley, 482 U.S. 78, 84 (1987)). Although Plaintiff has the right to send and receive mail, within the boundaries set by the prison, he has not demonstrated the existence of irreparable harm merely by alleging that his mail has been tampered with.

Finally, Plaintiff requests that defendants be prevented from denying him notary services. As the Supreme Court has expressed, "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." Sandin v. Conner, 515 U.S.

472, 482 (1995) (citations omitted). In this regard, "it is well established that federal courts should not micromanage state prison systems." Baker v. Holden, 787 F. Supp. 1008, 1015 (D. Utah 1992) (citations omitted). "Moreover, a federal judge is not a warden and substantial deference must be accorded state prison authorities in the management of correctional facilities." Id. at 1015-16 (citing Bell v. Wolfish, 441 U.S. 520, 547 (1979); Turner v. Safley, 482 U.S. 78, 84 (1987); O'Lone v. Estate of Shabazz, 482 U.S. 342, 353 (1987)).

With respect to his other allegations (food was removed from his tray and an inmate with hepatitis was encouraged to "spit his death" on him, he was placed on grievance restriction, and female correctional staff are not permitted to work on the LTSU), they do not suggest with any degree of certainty that he is setting forth a factual basis which demonstrates that he will ultimately prevail on the merits or that he will suffer irreparable harm if relief is not granted.

In addition, he has not demonstrated that a balancing of the harms weighs in his favor. The balancing of harms essentially requires the court to measure the harm to the plaintiff if the preliminary relief is erroneously denied and the harm to the defendant if the preliminary relief is erroneously granted. See Faheem-El v. Klincar, 841 F.2d 712, 717 (7th Cir. 1988) (a preliminary injunction analysis "requires the district court to assess the probability that each party will prevail on the merits and the harm of granting or withholding relief during the pendency of the suit."); Blackwelder Furniture Co. v. Selig Manufacturing Co., Inc., 550 F.2d 189, 196 (4th Cir. 1977) ("The decision to grant preliminary relief cannot be intelligently made unless the trial court knows how much the precaution will cost the defendant."). Although the harms alleged by Plaintiff may be serious, the harms to the defendants are no less substantial. An erroneously entered TRO will deny the right of the sovereign Commonwealth to have officers exercise their

discretion in the difficult operation of state prisons.

> When a plaintiff seeks to enjoin or prohibit the activity of a government agency, his case must contend with the well-established rule that the government has traditionally been granted the widest latitude in the dispatch of its own internal affairs. <u>Cafeteria Workers v. McElroy</u>, 367 U.S. 886 (1961).  Accordingly, when due process contentions are raised relative to the operation, maintenance and administration of the penal system, the courts should be acutely aware that caution must be exercised in achieving a careful balance of the interests of that system as against the interests of the prisoners.

<u>Marchesani v. McCune</u>, 531 F.2d 459, 461 (10th Cir. 1976).

Accordingly, it is recommended that Plaintiff's motion for a preliminary injunction and/or for a temporary restraining order be denied without prejudice.

Within ten days after being served with a copy, any party may serve and file written objections to the report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

                                      Respectfully submitted,

                                      s/Robert C. Mitchell
                                      ROBERT C. MITCHELL
                                      United States Magistrate Judge

Dated: November 9, 2005

cc:    The Honorable Donetta W. Ambrose
       United States Chief District Judge

       Keith Brown, DV-0255
       SCI Fayette
       P.O. Box 9999

LaBelle, PA  15450-0909

Rodney M. Torbic
Office of the Attorney General
564 Forbes Avenue
6th Floor, Manor Complex
Pittsburgh, PA 15219

Elizabeth M. Yanelli
Pietragallo, Bosick & Gordon
One Oxford Centre
38th Floor
Pittsburgh, PA 15219